UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

Jon D. Higgins,

        Plaintiff,

v.

Union Pacific Railroad Co.,

        Defendant.

Court File No. _____

**COMPLAINT**
**(JURY TRIAL DEMAND - OMAHA)**

Plaintiff Jon D. Higgins (hereinafter "Higgins") by and through his attorneys, brings this action for damages and other legal and equitable relief, stating the following as his claims against Defendant Union Pacific Railroad Co. (hereinafter "Defendant" or "Union Pacific"):

## NATURE OF ACTION

1. This case arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA"), the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff *et seq.* ("GINA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

## PARTIES

2. Higgins is an individual who resides in North Platte, Nebraska.

3. Defendant is a railroad carrier engaged in interstate commerce. Its headquarters is in Omaha, Nebraska.

4. Defendant employs approximately 44,000 persons and runs in upwards of 8,000 trains on 30,000 miles of track all across the country west of Chicago and New Orleans.

5. Higgins became an employee of Defendant in August 1975, as a Fireman/Oiler. Higgins later became a Locomotive Engineer for Defendant. Higgins' employment with

Defendant lasted from 1975 until late 2014, when Defendant informed Higgins that it was permanently taking him out of service.

## JURISDICTION AND VENUE

6. Higgins' claims arise under the ADA, GINA, and the FMLA. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

7. This Court has personal jurisdiction over Defendant because its headquarters is in Nebraska, and because the case arises out of Defendant's actions in Nebraska.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant resides in the district.

## FACTUAL ALLEGATIONS

9. Higgins sustained a workplace injury to his back in 1989, while on the job with Defendant. Following surgery and a recovery period of approximately nine months, Higgins was able to return to work.

10. Higgins sustained a second workplace injury, this time to his neck, while on the job for Defendant in approximately 1990, 1991, or 1992. Again, Higgins was out of work for a period of time, receiving treatment and recovering from his injury. Both the 1989 injury and the injury in the early-1990s were injuries to Higgins' spine.

11. Ever since he was injured, Higgins has suffered from occasional flare-ups of back pain. These flare-ups are unpredictable as to when they will occur and how long they will last. When they do occur, Higgins is unable to work because of the pain.

12. At various times between the early 1990s and 1999, Defendant threatened to investigate Higgins for absenteeism, relating to the fact that Higgins needed occasional time off work when his back pain flared up as a result of his on-the-job injuries.

13. In or around 1993, Higgins and Defendant formally agreed that Higgins would be permitted to "lay off" from work intermittently, when his back pain flared up. Defendant and Higgins agreed that Higgins would not suffer any repercussions as a result of these occasional layoffs. At the same time, Higgins and Defendant agreed that Higgins would occasionally need 24 hours off between shifts or trips, and that Higgins would not suffer repercussions as a result of that.

14. Though Defendant agreed to Higgins taking voluntary layoffs when his back pain flared up, Defendant seems to have resented this arrangement from the beginning. In 1998, Defendant issued a Notice of Investigation to Higgins and created a Proposed Notice of Discipline for alleged excessive absenteeism. In an email chain in 1999, a management employee of Defendant discussed with others in management how Defendant might find a way to "attack" Higgins' right to layoffs by subjecting Higgins to medical fitness-for-duty evaluations. This employee ultimately concluded, however, that he did not "really think we can do much about this," because of the "risk of being named in a lawsuit" by Higgins.

15. With the limited accommodations discussed above, Higgins has been able to perform his essential job functions with Defendant for the 25-plus years since his back injury.

16. In 2013, Defendant again began to badger Higgins about his attendance, claiming that Higgins had poor attendance, which could result in discipline. This was despite the fact that Higgins and Defendant had agreed that Higgins could lay off when necessary, and also despite the fact that Higgins' layoffs for his back pain had not increased in frequency or duration since the parties had reached their agreement back in the early 1990s.

17. Defendant's harassment of Higgins intensified in 2014. Defendant wrote multiple letters to Higgins about his attendance; requested that Higgins provide medical and other

3

documentation regarding his attendance; called Higgins on the telephone about his attendance on a number of occasions; and confronted Higgins about his attendance in person.

18. In August 2014, Defendant again sent Higgins a "Notice of Investigation" about his attendance, charging Higgins with a rules violation for his attendance and requiring him to appear for a hearing.

19. Amid the harassment, and the later threat of investigation, Higgins began to experience anxiety and depression issues as the pending investigation approached. This anxiety manifested itself in digestive troubles and difficulty sleeping, among other symptoms.

20. On or about September 8, 2014, Higgins suffered an anxiety attack while on duty for Defendant, on a rail trip back to North Platte from Missouri Valley, Iowa. During the anxiety attack, Higgins experienced tingling and flushing of the face, an upset, cramping stomach, and intermittent bouts of diarrhea.

21. Higgins filled out and submitted to Defendant a "Report of Personal Injury or Occupational Illness" form based on the anxiety attack he had suffered.

22. After receiving Higgins' injury report, and purportedly due to concerns about Higgins' anxiety, Defendant removed Higgins from service, and required him to undergo a fitness-for-duty evaluation on October 1, 2014.

23. The fitness-for-duty evaluation required Higgins to go to a physical therapist's office for testing. As part of the testing, Higgins was required to walk a distance, carrying in front of him a box into which was placed increasing amounts of weight. When the box was weighted with 55 pounds in it, Higgins suffered a back spasm, which caused him to drop the box and fall to the ground. Higgins twisted his ankle in the fall.

24. Despite falling during the fitness-for-duty testing, Higgins passed the test, with the physical therapist recommending that "Mr. Higgins is able to safely complete work duties as an Engineer for" Defendant.

25. Higgins filled out and submitted another injury report to Defendant based upon his fall and the ankle injury.

26. Following Defendant's receipt of this second injury report, Defendant instructed Higgins to sign an authorization for the release of his medical records, so that it could investigate the events that caused the ankle injury. Higgins signed an authorization as instructed. The authorization that Higgins signed only allowed for the release of his medical records and information relating to the October 1, 2014 ankle injury, and Higgins was told that the authorization would be used only for that purpose.

27. However, after the limited authorization was provided to Higgins' medical providers at Midland Family Medicine, an employee of Defendant called Midland and requested Higgins' entire medical file. Upon information and belief, Defendant, without Higgins' permission, also changed a date on the authorization and re-submitted it to Midland with the new date. As a result of these actions, Midland Family Medicine released Higgins' entire medical file to Defendant. Higgins' medical file contained, or was likely to contain, genetic information.

28. On or about December 4, 2014, Defendant informed Higgins that it could not accommodate Higgins' medical restrictions—which had been in place since the 1990s—and that Higgins would not be returned to work. This was despite the fact that Higgins needed the same accommodation in 2014 as Defendant had been providing since roughly 1993, and despite the fact that Higgins was not abusing the accommodation—he was using approximately the same amount of layoff time in 2014 as he always had.

29. Higgins has not been allowed to return to work since the fitness for duty evaluation, and was forced to seek disability benefits.

30. On January 15, 2015, Higgins filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the Americans with Disabilities Act and the Genetic Information Nondiscrimination Act.

31. The EEOC issued Higgins a right to sue letter on or about September 23, 2016.

## CAUSES OF ACTION

## COUNT I

### VIOLATIONS OF THE ADA
### DISABILITY DISCRIMINATION—DISPARATE TREATMENT

32. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

33. At all relevant times, Higgins was an individual with a disability under the ADA.

34. At all relevant times, Higgins had the requisite skill, experience, education and other job-related requirements for the positions, and was therefore a qualified individual under the ADA.

35. At all relevant times, Higgins could perform the essential functions of his position, with or without reasonable accommodations.

36. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

37. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112 (b)(6).

38. Defendant discriminated against Higgins on the basis of disability.

39. Because Defendant violated 42 U.S.C. § 12112, Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

40. Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT II

### VIOLATIONS OF THE ADA
### UNLAWFUL MEDICAL INQUIRIES

41. At all relevant times, Higgins was an employee of Defendant.

42. Section 12112(d)(4)(A) of the ADA provides:

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

43. Defendant violated 42 U.S.C. § 12112(d)(4)(A) when it sought medical documents beyond those that Higgins had authorized in an effort to learn about Higgins' disabilities.

44. Because Defendant violated 42 U.S.C. § 12112(d)(4)(A), Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in

excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

    45.    Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT III

### VIOLATIONS OF THE ADA
### FAILURE TO ACCOMMODATE

    46.    Higgins is a qualified individual with disabilities under the ADA.

    47.    Discriminating against a qualified individual with a disability includes:

> [N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 U.S.C. § 122112(b)(5)(A).

    48.    Defendant discriminated against Higgins when it refused to continue allowing Higgins to use the reasonable accommodations that had allowed him to do his job ever since he suffered his back and neck injuries in 1989 and the early-1990s.

    49.    Because Defendant violated the ADA, Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

    50.    Defendant committed the above-alleged acts with reckless disregard or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT IV

### VIOLATIONS OF THE ADA

## DISABILITY DISCRIMINATION—DISPARATE IMPACT

51. Higgins is a qualified individual with disabilities under the ADA.

52. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

53. Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability". 42 U.S.C. § 12112(b)(3).

54. Defendant discriminated against Higgins on the basis of disability.

55. Defendant's fitness-for-duty policies and practices disproportionately—and adversely—impact qualified individuals with disabilities.

56. Defendant uses qualification standards that screen out, and tend to screen out, individuals with disabilities.

57. Defendant cannot show that such qualification standards are job-related and consistent with business necessity.

58. Because Defendant violated 42 U.S.C. § 12112, Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

59. Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT V

### VIOLATIONS OF THE ADA
### RETALIATION

60. The ADA prohibits retaliation against an individual because he opposes unlawful discrimination, seeks accommodations, files a complaint, or testifies, assists, or participates in an investigation or proceeding under the ADA. 42 U.S.C. § 12203. The ADA also prohibits coercion, intimidation, threats, or interference with an individual's exercise or enjoyment of his rights under the ADA. 42 U.S.C. § 12203(b).

61. Defendant's conduct described herein constitutes coercion, intimidation, interference, and retaliation against Higgins because Higgins opposed Defendant's disability discrimination and requested reasonable accommodations.

62. Because Defendant violated the ADA, Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

63. Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT VI

### VIOLATIONS OF GINA

64. Section 2000ff-1(b) of GINA provides that it "shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member."

65. Requesting genetic information includes "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." 29 C.F.R. § 1635.8(a).

66. Genetic information includes family medical history. 42 U.S.C. § 2000ff(4); 29 C.F.R. § 1635.3(c)(iii).

67. Higgins was Defendant's employee under GINA.

68. By its conduct described herein, Defendant violated GINA by requesting and obtaining Higgins' entire medical file, against Higgins' wishes and authorization.

69. Because Defendant violated GINA, Higgins has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

70. Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## COUNT VII

### VIOLATIONS OF THE FMLA
### RETALIATION AND INTERFERENCE

71. The FMLA, 29 U.S.C. § 2612(a)(1), entitles employees to up to twelve weeks of leave during any twelve month period for certain reasons, including the employee's serious health condition.

72. 29 U.S.C. § 2615(a) of the FMLA provides that it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any rights provided under the FMLA.

73. 29 U.S.C. § 2615(a) also forbids an employer from retaliating against employees for exercising their right to take the statutorily protected leave.

74. Defendant's conduct described herein constitutes interference with Higgins' FMLA rights, and/or retaliation against Higgins for exercising his FMLA rights, in violation of the FMLA.

75. Because Defendant violated the FMLA, Higgins has suffered and will continue to

suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Higgins is also entitled to attorneys' fees and costs incurred in connection with these claims.

76. Defendant committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Higgins. As a result, he is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jon D. Higgins prays for judgment against Defendant Union Pacific as follows:

1. That the practices of Defendant complained of herein be determined and adjudged to constitute violations of the ADA, GINA, and the FMLA;

2. That Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, be enjoined from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages, all in an amount in excess of $75,000;

4. For an award of pre-judgment interest pursuant to law;

5. For an award of Higgins' costs, disbursements and attorneys' fees pursuant to law;

6. For all relief available under the ADA, GINA, and the FMLA;

7. For such other and further relief available by statute;

8. For such other and further relief as the Court deems just and equitable; and

9. For leave to amend the Complaint to add claims arising under state law.

Dated: December 9, 2016

**PERRY, GUTHERY, HAASE & GESSFORD, P.C., L.L.O**

/s/ Corey Stull
Corey L. Stull, NSBA #21336
cstull@perrylawfirm.com
Jeanette Stull, NSBA #21257
jstull@perrylawfirm.com
233 South 13th Street
Suite 1400
Lincoln, NE 68508
Telephone: (402) 476-9200
Fax: (402) 476-0094

**NICHOLS KASTER, PLLP**

David E. Schlesinger* (MN #0387009)
Charles A. Delbridge* (MN #0386639)
schlesinger@nka.com
cdelbridge@nka.com
80 South Eighth Street
4600 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878
*pro hac vice application forthcoming*

**ATTORNEYS FOR PLAINTIFF HIGGINS**