## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JON D. HIGGINS, | 8:16CV539 |
| Plaintiff, | |
| vs. | MEMORANDUM |
| UNION PACIFIC RAILROAD CO., | AND ORDER |
| Defendant. | |

This matter is before the Court on the Motion for Summary Judgment, ECF No. 49, filed by Defendant Union Pacific Railroad Co. For the reasons stated below, the motion will be granted.

## BACKGROUND

The following facts are those stated in the parties' briefs, supported by pinpoint citations to evidence in the record, and admitted, or not properly resisted, by the opposing party as required by NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

Plaintiff Jon Higgins began working as a Locomotive Engineer for Union Pacific in 1976. Supp. Brief ¶ 7, ECF No. 56, Page ID 479. He was based out of North Platte, Nebraska, and typically worked on trains routed from North Platte to Council Bluffs, Iowa. *Id.* ¶ 10, Page ID 480.

---

[1] See NECivR 56.1(b)(1) (effective December 1, 2016):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

A Locomotive Engineer is a "safety sensitive" position, responsible for regulating the speed of moving trains and ensuring compliance with safety protocols. *Id.* ¶¶ 8–9. A Locomotive Engineer's mishandling of a train can cause a derailment or collision. *Id.* ¶ 9. Union Pacific assigned Locomotive Engineers to groups of engineers called "pool turns," who accompanied trains on predetermined routes.[2] *Id.* ¶ 11. When a train was preparing to depart, the next engineer in the pool turn scheduled to work received an automated telephone call asking the engineer to accept the shift or decline it by choosing to "lay off." *Id.* Engineers who chose to lay off were required to explain why, such as citing an illness or other personal reason. *Id.* ¶ 12.

When an engineer laid off, Union Pacific turned first to the "extra board," a group of engineers who filled short-notice vacancies.[3] *Id.* ¶ 13. If no one on the extra board was available, Union Pacific called another engineer in the pool turn. *Id.* ¶ 14.

## I. HIGGINS'S INJURIES AND UNION PACIFIC'S ACCOMMODATION

In 1989, the train on which Higgins was working "hit some bad rail going around a curve," throwing Higgins from his chair onto the floor. Opp. Brief ¶ 9, ECF No. 62, Page ID 589. Higgins suffered a crushed disc in his spine, was hospitalized for three weeks, and eventually had back surgery. *Id.* ¶ 10. The operating neurosurgeon advised Higgins that he would experience intermittent back pain the rest of his life. Supp. Brief ¶ 15, ECF No. 56, Page ID 481.

In March of 1990, Higgins's neurosurgeon released Higgins to "return to full-time work within the limits of his comfort." Opp. Brief ¶ 15, ECF No. 62, Page ID 590

---

[2] The parties dispute how many engineers were in the engineer pools in the North Platte Service Unit. Union Pacific stated that usually the boards were made up of between twenty and thirty engineers, while Higgins stated that North Platte pools could be as large as 150. *See* Opp. Brief ¶ 11, ECF No. 62, Page ID 577.

[3] The parties dispute whether engineers on the extra board also had regular pool turns. *See id.* ¶ 13.

(quoting Gogela Ltr., ECF No. 63-8, Page ID 757).  On March 24, 1990, Higgins's union representative, Tom Sullivan, wrote to Union Pacific Director R.D. Arney, stating that Higgins would have to "lay off from time to time as a result of his injury."  *Id.* ¶ 16 (quoting Sullivan Ltr., ECF No. 65-3, Page ID 899).  A Union Pacific internal correspondence, dated April 3, 1990, showed managers discussing "what our position should be regarding Engineer Higgins laying off periodically" for his injury.  *Id.* ¶ 14 (quoting Arney Email, ECF No. 65-4, Page ID 900).  Sullivan wrote again to Union Pacific management on August 28, 1990, November 18, 1991, and February 10, 1992, following up on Higgins's need for laying off.  *Id.* ¶ 18.

In 1991 or 1992, Higgins's train hit a "dip in the rail," causing his head to "snap back" and resulting in a herniated disk in his neck.  *Id.* ¶ 11, Page ID 589; *id.* ¶ 16, Page ID 578.  Higgins alleges that after his second injury he entered into a written settlement agreement with Union Pacific.  *Id.* ¶ 12, Page ID 590.  Per this agreement, Higgins released his claims against Union Pacific in exchange for settlement payments and permission to lay off as needed due to his back pain.  *Id.* ¶¶ 12 &13.  Higgins states that he has lost any written record of the agreement.  *Id.* ¶ 14.  Union Pacific denies "that the parties entered a written settlement agreement or that it contained an alleged provision regarding Higgins' ability to lay off."  Reply Brief ¶¶ 12–13, ECF No. 68, Page ID 967.

On March 12, 1992, Higgins's physician, Dr. Brittan, wrote a letter to Union Pacific, stating that Higgins was released to work "with the only restriction being that he should not go out more often than every 24 hours."  Opp. Brief ¶ 19, ECF No. 62, Page ID 590 (quoting Brittan Ltr., ECF No. 65-6, Page ID 902).  On June 29, 1992, Union Pacific Assistant Medical Director Dr. Richard Peters wrote to Union Pacific

Superintendent John Holm, stating that "[t]he medical director's office supports the restriction that on occasion Jon Higgins should not go out on a job assignment more than once every 24 hours."  *Id.* ¶ 19 (quoting Peters Email, ECF No. 65-8, Page ID 904).

On April 7, 1993, Union Pacific Superintendent M.E. Ring wrote to Higgins, stating:

> This letter serves as an acknowledgement of the agreement between you and former Superintendent Transportation Services, John Holm, with regard to allowable lay-offs.
>
> I have no problem with you laying off when medically necessary. With each occurrence, however, I will expect your supervisor to be provided with a medical slip from your treating physician outlining in detail the medical necessity for the lay-off.  Additionally, these lost work periods will be monitored for frequency and timing, and in no way exempt you from discipline if abused.

ECF No. 52-2, Page ID 323.  Higgins alleges that the letter "purport[ed] to place additional conditions on the previous agreement" with its documentation requirement and threat of discipline.  Opp. Brief ¶ 23, ECF No. 62, Page ID 591.

## II. HIGGINS'S ATTENDANCE

### A. 1990–2004

On December 28, 1998, Union Pacific sent Higgins a "Notice of Formal Investigation," for his "excessive absenteeism."  Opp. Brief ¶ 25, ECF No. 62, Page ID 592 (quoting Notice Ltr., ECF No. 63-11, Page ID 760.).  That same day, Higgins's manager, Tim Burkhart, emailed Union Pacific Manager Rick Folker, stating,

> I see Mr. J.D. Higgins continues to come up on the worst of the worst list regarding absenteeism. This induividual [sic] has been given to [sic] right to lay off whenever his back bothers him . . . as part of a settlement to a law suit involving a personal injury.

4

> I had a conversation with Kathleen Vance who heads up the EEO office and she suggested we might attack this from the medical department. I would assume this meant that Mr. Higgins would be medically re-evaluated. . . .
>
> Rick, I don't really think we can do much about this, at least on the local level. We run the risk of being named in a lawsuit for violating the terms of this individual's settlement.

*Id.* ¶ 26 (quoting Burkhart Email, ECF No. 65-9, Page ID 905). Union Pacific cancelled the investigation in January of 1999. *Id.* ¶ 27. On January 25, 1999, Dr. Brittan wrote a letter stating that "nothing has changed medically" as to Higgins's back injury and that his restrictions should be kept the same. *Id.* ¶¶ 27–28 (quoting Brittan Ltr., ECF No. 65-10, Page ID 906).

On October 26, 1999, Sullivan wrote a letter (Sullivan Letter) to Union Pacific Superintendent Rich Jensen, memorializing their agreement "that [Higgins] will not be disciplined as the result of him being absent from service." *Id.* ¶ 29, Page ID 593 (quoting Sullivan Ltr., ECF No. 65-11, Page ID 907). Jensen counter-signed the letter, indicating his agreement, and wrote "where layoffs are a result of [Higgins's] medical condition." *Id.* (quoting Sullivan Ltr., ECF No. 65-11, Page ID 907).

**B. 2004–2014**

In 2004, Michael Humpherys became the Manager of Training and Attendance for the North Platte Service Unit. *Id.* ¶ 30. In this position, Humpherys was eligible for a performance bonus, depending in part on meeting certain performance goals. *Id.* ¶ 31. One such performance goal was reducing the number of lay-offs. *Id.* On October 8, 2004, Humpherys reviewed Higgins's attendance record and noted that it was "[v]ery borderline," and that Humpherys would "[c]ontinue monitoring." *Id.* ¶ 34 (quoting ECF No. 63-14, Page ID 766). In late 2005, Humpherys recommended to Higgins's

supervisor that Higgins be given notice for his violation of the attendance policy. *Id.* ¶ 35, Page ID 594. Shortly after this, Humpherys discussed the Sullivan Letter with Superintendent Cameron Scott, who told Humpherys that the "[l]etter stands." *Id.* ¶ 36 (quoting ECF No. 63-14, Page ID 766.).

On June 17, and September 23, 2008, Humpherys sent letters to Higgins, warning him that continued lay-offs could result in discipline. *Id.* ¶¶ 39–40. In November of 2010, Higgins provided a note from his physician, Dr. Jason Citta, at Union Pacific's request. The letter suggested that Higgins should be given three to four trips off per month due to his back. *Id.* ¶ 41, Page ID 595.

Union Pacific alleges that prior to 2011 it "had limited means to examine data regarding the specific attendance records of the 2,000 employees in the North Platte service unit." Supp. Brief ¶ 32, ECF No. 56, Page ID 484. According to Union Pacific, "[a]s a result of improved technology that became available in about 2011, Union Pacific began focusing on holding employees accountable for absenteeism as well as other aspects of the business designed to improve efficiency and profitability."[4] *Id.*

On January 1, 2011, Union Pacific's "Railroad Train, Engine, and Yard Attendance Policy" (TEY Policy) went into effect. *Id.* ¶ 28, Page ID 483. The TEY Policy states "[a]s a Union Pacific employee, you . . . are expected to protect your job assignment on a fulltime basis. 'Full-time' means being available to work your assignment, whether regular or extra, whenever it is scheduled to work." *Id.* ¶ 28. The policy further states that "[s]ubstantiating documentation is expected and may be required. However, notification and documentation alone do not excuse your

---

[4] Higgins denies that any technological changes altered Union Pacific's approach to its employees' attendance. *See* Opp. Brief ¶ 32, ECF No. 62, Page ID 580.

responsibility to protect your job.  You may be considered in violation of this policy regardless of the explanation offered if you are unable to work full time and protect all employment obligations."  ECF No. 56-9, Page ID 560.  The policy warned that, if an employee used lay-offs too frequently, "an investigation will be held; and, if appropriate, discipline will be issued based on the results of the investigation."  *Id.*  The job description for a Union Pacific Locomotive Engineer listed "[a]ttendance in compliance with the applicable attendance policy" as an essential function of the position.  Supp. Brief ¶ 28, ECF No. 56, Page ID 482–83.

The overall attendance in the North Platte service unit was measured by percentages derived from dividing the number of non-compensated layoffs by the total number of employees.  *Id.* ¶ 34, ECF No. 56, Page ID 484.  When Humpherys took over in 2004, this percentage was approximately eight percent.  *Id.*  To decrease this percentage, Humpherys first identified the employees with the highest number of non-compensated layoffs, which were individuals on the "E" list.  *Id.*  When Humpherys began addressing attendance issues in earnest in 2011, Higgins was not identified as an employee on the "E" list.  *Id.* ¶ 36.

On April 11, 2013 Higgins received a letter from Humpherys notifying him that Union Pacific was monitoring his attendance.  *Id.* ¶ 38.  In October 2013, Humpherys sent an email to a colleague in Union Pacific's Labor Relations office, among others, discussing Higgins's 1991 injury, the agreement allowing him to lay off for that injury, and stating that "Higgins has been a chronic absenteeism problem for years."  Opp. Brief ¶ 40, Page ID 62, Page ID 581–82.

In the spring of 2014, Humpherys's review of Higgins's attendance record showed that in 2012 and 2013, Higgins laid off on approximately 20 and 24 percent of his starts, respectively. Supp. Brief ¶ 40, ECF No. 56, Page ID 485–86. Humpherys sent Higgins an Attendance Alert and Advisory letter on April 2, 2014, which explained that his attendance was unsatisfactory under the TEY Policy. *Id.* ¶ 41.

Between May 11, 2014, and August 9, 2014, Higgins laid off on 26 percent of his shifts—eight non-compensated lay-offs and 23 starts. *Id.* ¶ 42. Union Pacific alleges that the rest of the engineers in Higgins's pool turn averaged approximately 38 starts during this same period.[5] *Id.* Higgins testified that all lay-offs were due to his back pain. *Id.* ¶ 43.

Union Pacific issued Higgins a Notice of Investigation letter, which stated that he was under investigation for a first offense under the TEY Policy and would have to report to a hearing on the matter. *Id.* ¶ 44, Page ID 487. In response, Higgins provided Union Pacific with a letter dated August 19, 2014, from Dr. Citta, which stated that as a result of his "intermittent and unpredictable" back pain, Higgins would be required to miss work "on an intermittent basis." *Id.* ¶ 45 (quoting Citta Ltr., ECF No. 52-5, Page ID 326)). No hearing was held. *Id.* ¶ 46.

## III. ANXIETY ATTACT AND FITNESS-FOR-DUTY EVALUATION

On September 8, 2014, Higgins filed an occupational injury report, in which he stated that he experienced an anxiety attack while on a locomotive. Higgins claimed the episode was caused by "stress and depression due to harassment by [Union Pacific] and North Platte manager Michael Hansen" regarding the investigation into Higgins's

---

[5] Higgins contends that "some engineers listed . . . had recently been transferred from the extra board, artificially inflating the average number of starts during the period" and that "a 'regular' in the engineer pool would get closer to 32 starts." Opp. Brief ¶ 42, ECF No. 62, Page ID 582.

attendance.  *Id.* ¶ 47 (quoting Injury Rep., ECF No. 52-6, Page ID 327–28).  This was Higgins's first and only panic attack.  *Id.* ¶ 48.  The same day Higgins submitted his injury report, Union Pacific removed him from service pending evaluation of his health.  *Id.* ¶ 50.

Higgins's immediate supervisor Matthew Patnaude, Director of Road Operation John Allberry, and manager Clay Nielson referred Higgins for a fitness-for-duty evaluation (FFD).  *Id.* ¶ 49.  Union Pacific contends that this decision was driven solely by safety concerns.  *Id.*  Nielson completed a FFD Request Form, in which he stated that the FFD was being requested due to Nielsen's "Absenteeism," "Deteriorating Performance," "Anxiety Attacks," and "Stress," among other issues described in Higgins's injury report.  ECF No. 52-25, Page ID 455.

As part of the FFD evaluation, Union Pacific requested that Higgins submit a "copy of clinic notes (also known as office notes or progress notes) from the provider treating your medical condition(s)" to the company's Health and Medical Services office.  Supp. Brief ¶ 50, ECF No. 56, Page ID 488 (quoting Med. Srvcs. Ltr., ECF No. 52-7, Page ID 329).

As part of his FFD evaluation, Higgins had to undergo a Functional Capacity Evaluation (FCE) on October 1, 2014.  *Id.* ¶ 52, Page ID 489.  During the FCE, Higgins was asked to lift a 40-pound box.  *Id.*  When additional weight was added to the box, Higgins dropped the box and injured his ankle.  *Id.*  Higgins alleged the ankle injury occurred on the job, and he submitted a second occupational injury report.  *Id.* ¶ 53.  Union Pacific requested that Higgins sign a consent to release his medical records, and Higgins verbally agreed that he would authorize records related to his "foot injury only"

but would not "consent to anything else." *Id.* ¶ 54 (quoting Higgins Dep. 169:9–13. ECF No. 52, Page ID 292).

On October 7, 2014, Higgins signed an authorization to release medical records that stated:

> I HEREBY AUTHORIZE any doctor, hospital, rehabilitation counselor, insurance or reinsuring company, or any other provider of medical or rehabilitation services to me, to release the information specified below to UNION PACIFIC RAILROAD COMPANY . . . .

ECF No. 52-10, Page ID 335. Below this paragraph was a table in which Higgins wrote his name, date of birth, social security number, and date of injury. *See id.* The release further stated:

> I UNDERSTAND that the information authorized includes matters with respect to loss or injuries sustained on the date shown above.

> I AUTHORIZE the release of my medical records, including any information available as to my diagnosis, treatment prognosis with respect to any physical or mental condition and/or the treatment thereof; as well as my medical history, or non-medical information to Union Pacific or to its representative.

*Id.* Higgins testified that he relied on his verbal limitation regarding the scope of the release. Supp. Brief ¶ 56, ECF No. 56, Page ID 490.

Union Pacific contract nurse Barbara Andersen sent a "Request for Medical Information" with an attached copy of Higgins's release to Dr. Citta and Midlands Family Medicine on or about October 24, 2014. The Request for Medical Information asked Midlands Family Medicine to provide Higgins's "entire medical chart, including diagnostic test results and prognosis." *Id.* ¶ 58.

In a May 18, 2015, letter, Dr. Citta wrote:

> In October 2014 Mr. Higgins sustained an occupational related injury to the right foot. Shortly after, this office received a medical records request signed by Mr. Higgins, releasing his medical records pertaining

only to the right foot injury. However, a member of our medical records staff received a phone call from a representative of Union Pacific railroad and advised our medical records employee that the wrong date was put on the medical records release and that in fact Mr. Higgins [sic] entire medical record should be released to them. Unfortunately, our medical records employee did provide Union Pacific railroad with the entirety of Mr. Higgins medical record.

It is my opinion that Union Pacific railroad placed this phone call to our Medical Records Department in order to receive the complete medical record of Mr. Higgins despite the fact the he had signed a release only for the medical records to his recent work related injury.

ECF No. 65, Page ID 889. Higgins stated in his deposition that one of Dr. Citta's employees told Higgins that Citta's office sent Higgins's entire medical file to Union Pacific. Higgins Dep. 186:10–16, ECF No. 52, Page ID 296.

At Midlands Family Medicine, Donna Hines, a medical records clerk, initially received the request for Higgins's records. Supp. Brief ¶ 63, ECF No. 56, Page ID 491. In her deposition, Hines stated that her regular practice was not to send a patient's entire medical file but rather to provide only the documents related to a specific date request and that if she received a request for an individual's entire medical chart, she would not provide it without further documentation. *Id.* 64.[6] Hines did not recall sending Higgins's entire medical file to Union Pacific, and Midlands Family Medicine kept no records regarding what documents it may have sent. *Id.* ¶ 65. Union Pacific contends that it has no record of ever receiving the entire medical file. Supp. Brief ¶ 60, ECF No. 56, Page ID 490.

In September 2014, in connection with Higgins's FCE, Union Pacific inquired of Dr. Citta about Higgins's back injuries. *Id.* ¶ 66, Page ID 491. Dr. Citta responded on October 2, 2014, stating that Union Pacific should "[c]ontinue allowing [Higgins] to layoff

---

[6] Certain portions of Hines's deposition to which Union Pacific cites appear to be missing from Union Pacific's submission at ECF No. 56-4. However, Higgins does not dispute the content cited by Union Pacific, *see* Opp. Brief ¶¶ 63–65, ECF No. 62, Page ID 584, and it is therefore admitted.

as needed secondary to his back pain as per the agreement from 1999." *Id.* (quoting Citta Ltr., ECF No. 52-12, Page ID 339). Dr. Citta also wrote that Union Pacific should "[c]ontinue providing at least 24 hours off between shifts or trips." *Id.* ¶ 67, Page ID 492 (quoting Citta Ltr., ECF No. 52-12, Page ID 339). The parties agree that the letter should have said Union Pacific needed to *occasionally* provide 24 hours of rest. *Id.* Although Higgins discussed the omission with Dr. Citta, Higgins did not clarify the matter with his superiors at Union Pacific, because he believed Union Pacific understood what was meant. *Id.* ¶ 68.

After discussions with Higgins and a review of various documentation from Dr. Citta, Union Pacific's Health and Medical Services Department updated Higgins's permanent restrictions as "1. May sit up to 6 hours intermittently;" "2. May stand up to 2 hours intermittently;" "3. May walk up to 2 hours intermittently;" "4. May work 8–12 hours per day;" "5. May lift up to 20 pounds frequently (33–66% of workshift);" "6. May lift 21 to 100 pounds occasionally (5–33% of workshift);" "7. May never lift over 100 pounds;" "8. Must have 24 hours rest per shift (between shifts)." *Id.* ¶ 78, Page ID 494 (quoting ECF No. 52-30, Page ID 473).

Higgins admits that these were appropriate restrictions, except that he needed 24 hours of rest between shifts only occasionally, and the restrictions should have indicated that he had to be allowed to lay off as needed. *Id.* ¶ 79, *see* Opp. Brief ¶ 79, Page ID 586.

## IV. TERMINATION

On December 4, 2014, Union Pacific sent Higgins a letter that stated Union Pacific could not accommodate Higgins's permanent restrictions. *Id.* ¶ 88, Page ID 496.

That same day, Union Pacific sent another letter to Higgins advising him of his options and instructing him to call Union Pacific's Disability Management Department for assistance. *Id.* ¶¶ 89–90. Higgins informed UP that he did not want to relocate from North Platte for another position. *Id.* Union Pacific thereafter terminated Higgins's employment.

Higgins filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on January 15, 2015, alleging violations of the Americans with Disabilities Act (ADA) and the Genetic Information Nondiscrimination Act (GINA). The EEOC issued Higgins a right-to-sue letter on September 23, 2016. Higgins filed this action on December 9, 2016. In his Complaint, ECF No. 1, Higgins alleged various violations of the ADA, including "Disability Discrimination—Disparate Treatment" (Counts I & IV), Unlawful Medical Inquiries (Count II), Failure to Accommodate (Count III), and Retaliation (Count V), as well as violations of GINA (Count VI) and the Family Medical Leave Act (FMLA) (Count VII).

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the

nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)).  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325).  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042).  "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment.  *Dick v.*

*Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

Union Pacific has moved for summary judgment on all of Higgins's claims. Higgins does not dispute that his FMLA claim should be dismissed. The Court will examine his remaining claims under the ADA and GINA.

**Count I: Disparate Treatment under the ADA**

The ADA prohibits covered employers from discriminating against "a qualified individual" on the basis of a disability with regard to the terms and conditions of the individual's employment. 42 U.S.C. § 12112. When, as here, a plaintiff brings an ADA claim supported by circumstantial evidence, the claim is analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996 (8th Cir. 2014). Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Id.* "The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. If defendant meets that minimal burden, plaintiff must show that the proffered

nondiscriminatory reason is merely a pretext for unlawful . . . discrimination." *Id.* (alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003)).

To establish his prima facie case, Higgins must establish that he (1) is disabled within the meaning of the ADA; (2) is qualified to carry out the essential functions of his position with or without a reasonable accommodation; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 657 (8th Cir. 2001).

The parties dispute whether Higgins's ailments render him disabled under the ADA. The Court does not reach this issue because, even if Higgins is disabled under the ADA, he is not a qualified individual, and his claim fails for that reason. In establishing a prima facie case, a plaintiff must show "that he was qualified to perform the essential functions of his position, with or without reasonable accommodation." *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012) (citing 42 U.S.C. § 12111(8)–(9); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999)).

"The determination of qualification involves a two-fold inquiry: (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation." *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000) (citing *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111–12 (8th Cir. 1995)). "If the employee establishes that she cannot perform the essential functions of the job without accommodation, she must also make a facial showing that reasonable accommodation is possible and that the

accommodation will allow her to perform the essential functions of the job." *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003) (citing *Cravens*, 214 F.3d at 1016).

Union Pacific argues that Higgins was unqualified because his need to lay off as required by his discomfort prevented him from performing an essential function of his job. According to Union Pacific, such an accommodation would have violated the attendance policy and meant that Higgins was working less than full time. "[R]egular attendance at work is an essential function of employment." *Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008) (citing *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999)); *see Moore v. Payless Shoe Source, Inc.*, 187 F.3d 845, 848 (8th Cir. 1999) ("An employee who is 'unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones.'" (alteration in original) (quoting *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997))).

Higgins argues that full-time attendance was not an essential function of his job because allowing him to lay off as needed was a reasonable accommodation. Opp. Brief, ECF No. 62, Page ID 621 ("The 'determination of what functions are essential is fact-specific.' And the facts of this case clearly demonstrate that accommodating Higgins's occasional layoffs was possible and reasonable, since [Union Pacific] did just that for 25 years." (internal citation omitted) (quoting *Barnes v. Nw. Iowa Health Ctr.*, 238 F. Supp. 2d 1053, 1082 (N.D. Iowa 2002))).

The U.S. Court of Appeals for the Eighth Circuit has held that "an employee who cannot attend work cannot perform the essential functions of his job" even if "the absences are with the employer's permission." *Schierhoff v. GlaxoSmithKline*

*Consumer Healthcare*, L.P., 444 F.3d 961, 966 (8th Cir. 2006) (citing *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 777 (8th Cir. 2001)). In *Pickens*, the plaintiff was a railroad conductor who suffered an on-the-job back injury. Because of the back injury, the plaintiff "regularly made himself unavailable for work by exercising his right to 'lay off' under the railroad's collective bargaining agreement." *Pickens*, 264 F.3d at 775 & n.3. After his termination, the plaintiff brought suit under the ADA, arguing that he was a qualified individual "regardless of his excessive absences given the nature of the railroad's scheduling structure," which allowed him to lay off at his choosing. *Id.* at 777. The Eighth Circuit rejected that argument and held that "[e]ven though the railroad's system of scheduling appears quite flexible, the railroad's policy requires regular, reliable attendance, and [the plaintiff's] job was full-time." *Id.* The court noted its prior holding that the "'[u]nfettered ability to leave work at any time is certainly not a reasonable accommodation,' and an employer is not required by the ADA to provide an unlimited absentee policy." *Pickens*, 264 F.3d at 778 (quoting *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir.1999)). Although the court acknowledged that "[t]he ADA does cite a part-time or modified work schedule as a reasonable means of accommodation," *id.* (citing 42 U.S.C. § 12111(9)(B)), it ultimately concluded that the plaintiff's proposed method of "work[ing] only when he feels like working" was unreasonable as a matter of law. *Id.*

Here, as in *Pickens*, Higgins used his employer's lay-off scheduling mechanism—as well as his prior agreement with Union Pacific—to balance his work and his back pain. And, as in *Pickens*, Higgins accumulated a large number of a lay-

offs[7] from a job that identified full-time work as an essential function. Neither Higgins's agreement with Union Pacific nor any prior Union Pacific acquiescence to lay-offs can transform Higgins into a qualified individual under the ADA. For this reason, Higgins cannot establish his prima facie case[8] and his claim for unlawful termination (Count I) under the ADA will be dismissed.

## Count III: Failure to Accommodate under ADA

Higgins's Failure to Accommodate claim fails for the same reason as his claim for disparate treatment. The ADA's prohibition of discrimination "against a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." 42 U.S.C. § 12112(b)(5)(A); *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) ("Under the ADA, an employer is required to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an undue hardship on the employer's business.").

Although discriminatory intent is not required in a failure-to-accommodate case, *see Peebles v. Potter*, 354 F.3d 761, 765–67 (8th Cir. 2004),[9] a plaintiff "must establish

---

[7] In *Pickens*, the Eighth Circuit stated "Pickens' choice to lay off twenty-nine times from October 1995 to August 1996 is excessive and eviscerates any regularity in his attendance." 264 F.3d at 777. Higgins admits that in 2013 he completed 99 jobs and laid off on 31, and that in 2012 he completed 93 jobs and laid off on 29, for a lay-off rate of 24% both years. Opp. Brief ¶ 58, ECF No. 62, Page ID 598. In 2011 and 2010, Higgins laid off on 26 and 24 jobs, respectively, but his number of jobs completed is unavailable. *Id.* From 2005 to 2009, Higgins's lay-off rate fluctuated between 16% (2009) and 33% (2007). *Id.*

[8] Because Higgins's need to lay off as required by his medical condition precluded his claim under the ADA, the Court need not consider the arguments regarding whether Higgins requested 24-hours' rest between each shift.

[9] Although *Peebles* addressed a failure-to-accommodate claim under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, "decisions interpreting either the ADA or the Rehabilitation Act are

both a prima facie case of discrimination based on her disability and a failure to accommodate it." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (quoting *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015)); *see Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) ("Discrimination under the ADA . . . encompasses both disparate treatment because of a disability and failure to provide reasonable accommodations to a qualified individual's known disability.").

For the reasons discussed above, Higgins's inability to attend work with sufficient regularity prevents him from fulfilling an essential function of his position and disqualifies him under the ADA.

Higgins also argues that his accommodation claim should proceed because Union Pacific failed to engage in an interactive process to determine if it could reasonably accommodate Higgins's disability. "Where the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations. *Battle*, 438 F.3d at 862 (8th Cir. 2006) (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999)). Even if Union Pacific did not engage in the process,[10] "if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Id.* at 864.

**Count IV: Disparate Impact under ADA**

Under the ADA, discrimination against a qualified individual includes:

---

applicable and interchangeable to claims under each statute." *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) (quoting *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)).

[10] Union Pacific alleges that it did engage in an interactive process with Higgins. The Court does not reach this factual issue.

> [U]sing qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112.

Higgins argues that Union Pacific's "practice of allowing non-physician managers to refer employees to fitness for duty evaluations, and then interact with the Health and Medical Services Department to influence the course of those fitness for duty evaluations, is a facially-neutral policy that has a disparate impact on individuals with disabilities." Opp. Brief, ECF No. 62, Page ID 633.

"A plaintiff in a disparate impact case must first establish a prima facie case of disparate impact by identifying a specific employment practice and then presenting statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff to suffer adverse employment action because of his or her membership in a protected group." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001) (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)). "If the plaintiff succeeds in making this prima facie showing, the burden then shifts to the employer to produce evidence demonstrating a legitimate business reason for the challenged practice." *Id.* (citing *Watson*, 487 U.S. at 997–98).

As with Higgins's disparate treatment claim and his failure to accommodate claim, Count IV fails because Higgins is not a qualified individual under the ADA. The Court also notes that Higgins has not introduced any statistical evidence to show that Union Pacific's FFD policy has a disparate impact. Higgins argues that such evidence is not explicitly required under Eighth Circuit law. Even if his assertion were true—a

question the Court does not reach—Higgins failed to rebut Union Pacific's evidence demonstrating a legitimate reason for the FFD policy. Specifically, Union Pacific presented evidence that managerial referrals of employees for FFDs is rooted in train safety. Higgins's experience makes this plain: Higgins reported experiencing a debilitating panic attack while responsible for the safety of a traveling locomotive, a situation obviously requiring immediate removal from his job duties, and referral for a medical evaluation. Higgins implies that such referrals should be made by medical professionals. But requiring that managers confer with medical professionals simply to refer an employee *to medical professionals* would insert a redundancy into a process that could result in catastrophe and loss of life. Such is not required by the ADA.[11]

**Count V: Retaliation under ADA**

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203. Higgins alleges that Union Pacific "intimidated, threatened, and interfered with Higgins in response to his enjoyment of the legally-mandated, and agreed-upon, reasonable accommodation," *i.e.*, his permission to lay off as needed. ECF No. 62, Page ID 634. "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful

---

[11] Higgins also argues that, in addition to referrals, Union Pacific allowed managers to "influence the course of those [FFDs]." ECF No. 62, Page ID 633. However, Higgins's only evidence is that he was referred for an FCE after the referring physician spoke with Higgins's superior, even though the referring physician's notes stated a FCE would be of little use. *Id.* This evidence is insufficient to establish the existence of an employment practice.

adverse-action was in retaliation for the protected conduct." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (quoting *Young-Losee v. Graphic Packaging In'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011)).

As stated, Higgins is not a qualified individual under the ADA and his proposed accommodation, that he lay off as needed, was unreasonable. The only evidence of retaliation Higgins identifies is the "letters and notices of investigation regarding attendance, which UP sent to Higgins in 1998, 2007–08, and again in 2013–14 . . . ."[12] ECF No. 62, Page ID 634. This evidence is insufficient to show Higgins suffered a materially adverse employment action.[13] *See Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 632 (8th Cir. 2016) ("[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." (quoting *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013))). There is no dispute that the letters sent to Higgins were form letters sent to all employees whose attendance fell below a certain threshold and they did not alter Higgins's duties or terms of employment in any way.

**Count II and Count VI: Unlawful Medical Inquiries under ADA and GINA**

Under the ADA "[a] covered entity . . . shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related

---

[12] The remaining evidence cited by Higgins—the 1998 Burkhart Email, ECF No. 65-9, in which Burkhart speculates "attack[ing]" Higgins's absenteeism "from the medical department," and an entry from a privilege log between Humpherys and Union Pacific's counsel—both go to retaliatory motive and do not establish Higgins suffered an adverse employment action.

[13] Higgins denies that his retaliation claim is based on his "new request for accommodations." *See* ECF No. 62, Page ID 633.

and consistent with business necessity."[14]  42 U.S.C. § 12112(d)(4)(A).  Higgins alleges Union Pacific violated this section "when it sought medical documents beyond those that Higgins had authorized in an effort to learn about Higgins' disabilities."[15]  Compl. ¶ 43, ECF No. 1, Page ID 7.  There is no dispute that Union Pacific requested Higgins's "entire medical chart," and Union Pacific does not dispute that this request was overbroad for its ostensible purpose—collecting information related to Higgins's ankle injury suffered during his FCE.  *See* Req. for Med. Info., ECF No. 52-20.  However, Higgins has failed to present sufficient admissible evidence for a jury to conclude that Union Pacific received his entire medical chart.

Higgins primary evidence[16] is the letter from Dr. Citta, which states that his "medical records employee did provide Union Pacific railroad with the entirety of Mr. Higgins' medical record."  ECF No. 65, Page ID 889.  However, in his deposition, Citta stated that he did not personally know what information his office sent to Union Pacific and, while he could not remember who told him about Union Pacific's request or that the whole file was sent, it would have been either Higgins or Donna Hines.  In her deposition, Hines said she did not remember what files she sent to Union Pacific, but her regular practice was not to send a patient's entire medical file.  *See* Supp. Brief ¶ 64, ECF No. 56, Page ID 491; ECF No. 56-4.  Hines also stated that if she received a request for an entire medical file like the one described in Citta's letter, she would not

---

[14] Unlike with his other ADA claims, Higgins "need not have a disability within the meaning of the ADA" to prevail under § 12112(d).  *See McPherson v. O'Reilly Auto., Inc.*, 491 F.3d 726, 732 (8th Cir. 2007).

[15] Union Pacific also argues that its referral of Higgins for a FFD was not a violation of § 12112(d)(4)(A), but Higgins's Complaint only identifies the medical documents inquiry as the basis of Count II.  Higgins's arguments in his brief only address the request for documents by Union Pacific and not the FFD referral.

[16] Higgins also stated in his deposition that an employee of Dr. Citta told him that their office sent Higgins entire medical file to Union Pacific.  Higgins Dep. 186:10–16, ECF No. 52, Page ID 296.  Higgins did not identify this employee.

send an entire chart without first seeking additional documentation and authorization. *See* Supp. Brief ¶ 64, ECF No. 56, Page ID 491.  Dr. Citta's letter contains hearsay, and the depositions reveal that the letter's contents are not based on Citta's personal knowledge.  *See Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) (citing *Brooks v. Tri–Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005)) ("[I]nadmissible hearsay evidence cannot be used to defeat summary judgment.").  Citta testified that the only two possible sources of that information were the plaintiff or Hines, whose deposition testimony fails to support, and substantially contradicts, the letter.  A reasonable jury could not conclude on this evidence that Union Pacific received Higgins's entire medical chart.

Without establishing that Union Pacific received the entire medical chart, Higgins cannot show he was injured by Union Pacific's violation.  Plaintiffs asserting claims under § 12112(d) must establish that the violation "caused some sort of tangible injury." *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999).  If Union Pacific did not receive Higgins's file, it could not have taken any injurious action based on the file's contents.

Higgins also argues that because he has alleged entitlement to punitive damages, he need not show injury-in-fact.  Union Pacific contends that injury-in-fact must be shown first, to establish liability, and is an analytically-distinct predicate to the question of what damages, punitive or otherwise, are owed a plaintiff.  ECF No. 68, Page ID 992 (citing *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 559 (5th Cir. 1998)). The Court does not reach this issue because, even if Higgins can use his claim to

punitive damages to sidestep the injury-in-fact requirement, he has not shown he is entitled to them.

"Although punitive damages are available in ADA cases, they are limited 'to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 903 (8th Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30 (1999)). "'The terms malice and reckless ultimately focus on the actor's state of mind,' and 'malice or reckless indifference pertain to the employer's knowledge that it may be acting in violation of federal law . . . .'" *Id.* (quoting *Kolstad*, 527 U.S. at 535.). Higgins implies that Union Pacific is guilty of "purposefully lying to a medical provider in order to obtain an employee's entire medical file," ECF No. 62, Page ID 636, presumably referring to the letter in which Dr. Citta stated that Union Pacific told Citta's office that "the wrong date was on the medical records release" and Union Pacific needed the whole file, ECF No. 65. As stated, the comment attributed to Union Pacific in the letter is hearsay, and Higgins has not brought forth further evidence of this alleged phone call. *See Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (holding that when a party objects to summary judgment evidence as inadmissible, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated"). Union Pacific concedes that at some point the date on the release was changed from October 1, 2014, to September 9, 2014, *see* Supp. Brief n.3, ECF No. 56, Page ID 490, but this is insufficient to establish that Union

Pacific acted with the requisite malice or reckless indifference to support a reasonable jury's award of punitive damages. For these reasons, Count II fails as a matter of law.

Higgins also presents a similar claim for unlawful medical inquiry, pursuant to GINA. Under GINA, it is unlawful for an employer to "request, require, or purchase" genetic information from an employee. 42 U.S.C. § 2000ff-1(b). Requesting genetic information includes "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." 29 C.F.R. § 1635.8(a). "The term 'genetic information' means, with respect to any individual, information about—(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4).

As with Count II, Higgins has not presented evidence to establish an injury-in-fact or to show that Union Pacific's request for medical information was conducted with the requisite state of mind to merit punitive damages. Count VI fails as well.

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment, ECF No. 49 will be granted, and Higgins's complaint will be dismissed, with prejudice. Higgins also moved for oral arguments, however, the Court finds that the parties' briefs were sufficiently helpful in evaluating the issues raised in Union Pacific's motion. Accordingly,

IT IS ORDERED:

1.  Defendant Union Pacific Railroad Co.'s Motion for Summary Judgment, ECF No.
    49, is granted;

2.  Plaintiff Jon Higgins's Motion for Oral Arguments, ECF No. 66,  is denied;

3.  Plaintiff Jon Higgins's Complaint, ECF No. 1, is dismissed, with prejudice,

4.  All other pending motions are denied, as moot; and

5.  A separate judgment will be entered.

Dated this 28th day of March, 2018.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge